Good morning. Before we proceed with argument, we began yesterday as we tend to do this time of year with the admission of law clerks, young lawyers, new lawyers to the bar of this court and I, one of whom, Judge Fisher, I saw at the is you were not among, were not accompanying him, I noticed, but at least you have someone in your chambers who sets an example that you cannot choose to follow or not. I saw him out at five just for the record. You can decide which one of us to believe on that. Good morning. We have listed for Re LTC Holdings, Inc. Mr. Kent. Good morning, panel. Andrew Kent on behalf of Appellant, the insurance company of the state of Pennsylvania. I'll just call them the surety more the fact that they didn't know Pennsylvania's commonwealth. Well, that acronym struck me immediately when I picked up the brief here, but I think that also makes it more understandable. Thank you. I'd like to reserve five minutes for rebuttal. Granted. My client is a surety. I'm going to refer to them as a surety and ordinarily at the common law, when a surety completes a defaulted contract, a surety can step into usually three sets of shoes, the shoes of the defaulted contractor with respect to their rights, the shoes of the obligee or the owner of the construction, a lot of times it's a construction contract, the owner of the construction contract who has certain rights, and sometimes when you pay a claimant under a payment bond, let's say a subcontractor that wasn't paid, you can step into their rights. At common law, it was an equitable remedy and it's applied equitably, but the bankruptcy code... 509A has altered that, is that... Well, I think it's meant to codify common law, but the problem is you have 50 sets of common law, so it's trying to codify it in a uniform way for bankruptcy... But it has introduced the concept of partial subrogation rights, has it not? That's right, Judge. All right. So before we get to... Really, we ought to start out here with a question regarding standard of review and then move on to the substantive points. The Bankruptcy Court has interpreted one of its own orders. We as an appellate court have to distinguish between a review of the Bankruptcy Court's application of legal principles and the review of the Bankruptcy Court's actual interpretation of an ambiguous provision. So that's contained within the Bankruptcy Court's own order. So what is the standard of review here? I think the standard of review, Judge, no matter how you look at this case, has to start with de novo. It could be a two-step process, but the first step is always going to be de novo, because there's always the threshold question of, is the order ambiguous, right? And the determination of whether the order is ambiguous or not is always a de novo. Is really the heart of this case about ambiguity or a lack of ambiguity? Is it about whether ambiguity was created by the settlement order and what was meant for the surety to reserve its rights? Ironically, Judge, both sides and the district court all said that the order is unambiguous. Somehow we are coming to different results. But the threshold question of whether it's ambiguous or not, I'd just like to go back to the long statement. So any ambiguity is really about the legal effects here. Would that be a fair characterization? I don't concede that there's an ambiguity. In order to have an ambiguity, there has to be two... I'm not suggesting ambiguity in the language itself. I'm suggesting ambiguity in the legal effects that result. But maybe that's a misuse of the word. Well, Judge, I don't think that there's room in the text of the order to allow for an ambiguous legal result. What the order says is that nothing in the stipulation will waive, stop, or otherwise limit the rights of certain litigants. Where does that get anybody? That's been my problem with this case from first picking up the blue brief. There's been no real reservation or preservation of anything substantively here, has there been? I mean, it's just been the reservation of a right to raise a right. It's not a reservation at all. I can reserve a right on behalf of my client. This stipulation came after a mediation that involved the United States of America, the trustee, the Bank of Montreal, my client, and another surety. Isn't it possible nothing at all would have been changed even if that language hadn't been part of a stipulation here? Unless you've explicitly waived something, there may be the right to raise it along the way anyhow. Well, maybe, Judge, but my problem wasn't my client waiving anything, we weren't waiving anything. My problem with the proposed stipulation at the time of the 1919 order was the government was purporting to waive its own rights, and my concern was... Well, beyond that, the government gave up claims it had, too. That's right. I mean, that's the only real substantive giveaway here. And the government agreed to put... Originally, they were going to completely waive a right of set-off in a tax refund. After my intervention and my motion and the mediation, they agreed to escrow that money so that the bank and my client could duke it out over who had first dibs in that money. That was the agreement. Now, when I first made my motion objecting to the stipulation, I said, look, this stipulation doesn't mention sureties. It doesn't mention subrogation, but... Or you were not a party to that. That's right, I wasn't. And I was concerned that somebody later on would look at the stipulation and say, when the government gave up its rights, it prejudiced your rights as subrogate. I looked it up, and I found the Chattagway case from the Second Circuit. And I looked at what happened to the Chattagway case. There was a surety in that case in a very similar situation. The government and a bankrupt company were heading into an agreement where the government was going to agree to a settlement. Chattagway is basically your case, right? I mean, that's... At the end of this, your argument is there's no ambiguity in the settlement agreement because it says every party, okay? And your client is a party, and Chattagway says that you get to pursue your claim. That's right. Basically. Yeah, and... But Chattagway isn't perfectly on point, right? It's not perfectly on point on all fours, but on the points I'm citing it to, I think they are perfectly on point. First off, what happened to the litigant, the surety in Chattagway, was they objected to a settlement in bankruptcy court. They said, hold on. This might impair my subrogation rights. I don't like it. The bankruptcy court said, too bad, you lose. They went to the district court. The district court said, too bad, you lose. Let them settle. They went to the second circuit, and the second circuit held, you guys can enter into the settlement. Go ahead. But it will not impair the rights of the surety. So I looked at that case, and I went to bankruptcy court and said, I want the same thing. And I cited Chattagway in my moving papers, and I submitted a form of order that said nothing in this order, or the stipulation, would impair the surety's subrogation rights. Do you agree you still owed, do you agree that your client still owed something to the United States at the time of the settlement? That my client still owed an obligation to the United States at the time of the settlement? Yeah, performance, money, something. No. Nothing. Everything was satisfied. Everything was completely satisfied. Okay. Okay? What was left hanging out there, right? We finished, we had a certificate of substantial completion on this one project in Afghanistan. Not easy thing to do. It's a letter, essentially. That's right. From the government, isn't it? Yes. And normally, the way it works in construction companies, especially with the governor, they start by giving you a letter of substantial completion. That has a punch list. The punch list are little warranty-type items, tighten a screw, paint a wall. Oh, yeah. I'm well familiar with that. Okay. That's what we had. And it's in the record. When did you get that? When did you get that letter? We got that letter in December of 2015, which was before the government entered into the settlement agreement. And if you take a look at the punch list on that job, it's little things like there's no warranty tag on this hot water heater, general cleanup in this room, fairly minor items like you would normally see in a punch list. And normally, there's a certain amount of retainage. That's right. For taking care of such matters. That's correct. Then, you go to a second stage, the contractor says, I'm done. Come back and give me 100%. Well, that happened. The final inspection was in February of 2016, right, which was before the settlement was approved. Okay. Now, it was in Afghanistan. It took them six months to get a letter out. But the letter said that the inspection took place on February 10, 2016. They said that they were taking use and occupancy of that facility. And they also said, right, even though there were a few punch list-y things left, those punch list-y things were only for extra work that they had agreed to on the side with the completion contractor. All right. But when did the surety make the final payment? Wasn't that September of 2016? Yeah. The surety made final payment to the completion contractor after we got written confirmation from the government that they accepted the work. However... So what? Whether it was the completion contractor or someone else? under Rule 11-509, okay, that was not a debt of the debtor, okay? What we owed to the completion contractor was not a debt that LTC owed to the government. It was a contractual obligation your client had by virtue of a surety shift in the agreement it entered into. It was a contractual obligation that we had in a side agreement called the Extra Completion Cost Agreement that was a bilateral agreement between us and the completion contractor. The government, in fact, agreed to and did give us a release before we made that final payment. The letter reflecting the release from the February 2016 inspection, okay, was in August. We made that final payment in September. The government was fine with that. Thank you. Thank you. We'll have you back on rebuttal, Mr. Kent. Mr. Benz. Your Honor, you may please record. My name is Mike Benz. I represent Apelli BMO Harris Bank. I'm joined today by my co-counsel, Rich Beck, from the Claire Harrison firm in Philadelphia. May we start, as we almost did, with your friend on the other side with a question as to the standard of review here? Yes, Your Honor. Both sides agree that the settlement order is non-ambiguous, although there is a question as to what it means from a legal perspective. I don't know if that's ambiguity so much as just uncertainty as to the answer. But that does not change the fact that Judge Sanchi entered the settlement order. I'm asking you about standard of review because there's a little bit of confusion on my part as to whether your position has been consistent on that. I believe that Mr. Kent and I agreed, or at least that he asserted, that our standard of review, and I'm wondering if you agree with that, because before the district court, I think you asserted that it was a plenary review, and I'm not sure whether you adhere to that position. I think that generally it is de novo. I do think, though, Your Honor, that there is some deference that is due to Judge Sanchi in respect of his interpretation of his own order. Have we spoken to that question? Have we as a court spoken to the difference and really what it means? I think that there has been some discussion of that in the Shenango case, and that was pointed out in our brief as well as in the reply brief. So both sides, you're indicating both sides agree that this is unambiguous, that there's no ambiguity here. Yes, Your Honor. Okay. And, you know, obviously it would be up to the court to decide whether to defer to Judge Sanchi in his interpretation of the settlement order, but we think that there is some deference that is due. Your Honor, this bankruptcy case was filed in May of 2014. It was filed as a Chapter 7 liquidation case from the outset. So we're now in year eight of the bankruptcy case. This is the last unresolved issue in the bankruptcy case. The trustee is waiting for resolution of this case before closing the bankruptcy case and making final distributions to creditors. So this five or five and a half million is the only issue that remains to be resolved? That's correct. There hasn't been any activity substantively on the bankruptcy docket. There are many creditors who lost a lot of money in this case, both creditors before you. I suspect the taxpayers of the United States might have lost a little bit of money along the way, too, in some of the construction contracts that I've read about. There were many unbonded jobs, Judge, that were not covered by surety obligations. The appellant advances a number of arguments, but... Just talk about your settlement construction for a minute, because I think I heard you say that the settlement isn't ambiguous. But I also leave you a position, is that ICSP's claim was subordinated and has now been delinquished. The settlement agreement pretty clearly says nothing in this order waives, stops, limits otherwise the rights of any party claiming an interest. So what is the reservation of rights provision? So first, just to be clear, do you agree that that is ordinarily understood to mean nothing in this is waived, and if you don't, then what is it that the reservation of rights clause is doing? Well, nothing is waived on the part of BMO Harris Bank as well. This stipulation contemplated an additional piece of litigation, which is the summary judgment before your honors, summary judgment order that's on appeal before your honors. The bank did not waive any of its arguments, which included the argument under 509 of the bankruptcy code. And if you examine the language of the order and the stipulation, 509 subordination is not addressed in the language, all right? What does it mean? Well, it means that whatever rights, if any, and whatever arguments, if any, are held to be resolved in a separate proceeding. And what it principally means, too, is that... So to say anything more than whatever rights we have, we have, and we're not going to tell you what they are, but we may assert them later. Right. It's a reservation of rights for whatever effect that may have, but certainly no other parties were acknowledging the strength of the arguments that the other side had in their mind. I mean, to me, it sounds like the parties entering into the stipulation were simply kicking the can down the road to determine at a later time what the substantive rights actually were. I think that that's right. That's why there was another piece of litigation. One thing that the surety did get and one thing that the surety wanted is to make sure that the tax refund was escrowed. Well, and the government, as I pointed out before, the government threw in the towel on whatever claims that they may have had against... There's no question. The United States did not reserve its rights. But BMO did and the surety did. So let's talk a little bit about Section 509. But let me stop you there, though. Sure. Everybody agreed to kick the can down the road. Correct. Including the United States. Well, the United States was not party to that second lawsuit. No, but they agreed to the order. They agreed to the escrow order. They did. Being submitted to the court. Did they not? They did. Okay. So, in effect, that kicked the can down the road to the next adjudicator as to whose rights came out where. Well... Correct? The United States was sort of out of the middle at that point. Well, they were, but the agreement said no one as a result of this agreement is given up any rights. That is true, but the United States... So the question here... Let me stop you at that point. It seems like the question here, and I mean this is a big question, is whether or not the United States' rights to set off their claims against this tax refund could be waived before the surety was able to assert its subrogation rights as a subordinate claim. That is a question under 509. That's a question, right? Yes, Your Honor. Okay. So, I mean, if we find that the surety had not lost its rights, either by waiver or under 509, that doesn't necessarily end this dispute, does it? No, because those rights would be subordinated, and as subordinated, they would be subject to release by the senior creditor. This is kind of like an inter-creditor... Right. I mean, you still would have a chance to go back and fight this battle if we said the United States did not waive the rights that they had as they applied to the surety. Well, but there's a problem there because there's a complete overlap between the rights of the United States and the rights of the surety. Correct. A hundred percent derivative. If you have a Venn diagram... Yeah, I got you. Yeah. It's one circle, not two. There's no way to split these rights. Yeah, I mean, so the ultimate question comes is what 509C means as to the surety's claim. That's right, and so we're dealing with a statute. We're not dealing with a law of decisional... Okay, it's not 509A, but it's 509C. That's correct. I mean, there's a... We get to 509C. It's not the easiest section to read, but I just wonder what the very last word of that section means otherwise. Well, I guess a payment in full could occur of the claim through payments outside of Chapter 11 somehow. I don't know what those would be, but the concern is really did the assured creditor get paid in full? Probably through the Chapter 11 or bankruptcy claims. It couldn't otherwise be interpreted to mean that since the surety wasn't really paying, the surety wasn't paying the United States. That's not what a surety does. Well, in this case, that's not what a surety does. The surety went out and got another contractor. Correct. They got another contractor to complete the police headquarters in Afghanistan, okay? And they had this separate side agreement to pay that contractor. And February 10th of 2016, the Corps of Engineers said the building's complete, the work's complete, okay? They argue that lets them off the hook. Couldn't that fall into this otherwise word? I don't think it can, Your Honor, because the test is not substantial completion. Here's an important fact. There's a letter that I think is at the record of ‑‑ But it just told me it says paid in full either through payments. Yes. And they weren't paying the U.S. Yes. Under this title or otherwise. And the otherwise, why couldn't it be argued that the otherwise was paying the contractor who stepped in for LTC? Because the bond was not released until August of 2016. If you look at the record, page A389, the bond was not released by the government until August of 2016, okay? So if it was paid in full, why wouldn't the bond have been released in February of 2016 at substantial completion? It wasn't. Why would these payments be made after the dated settlement order? They were. Why would the government have a claim that was allowed at the same time as the settlement was approved in the amount of $24 million on that particular job? How could that be paid in full if all those things are taking place? Those are our arguments, Your Honor. And respectfully, I think that the statute talks very mandatorily about the court shall subordinate the claim of the surety in this context. Until the claim, the claim has a very particular meaning in bankruptcy, here it's going to mean the proof of claim of the United States. And as to the assured part of the proof of claim, that is going to involve the $24 million that the National Police Command Center claim was allowed for. I mean, this is a cake-and-eat-it-too kind of argument. The surety wants to be senior as it relates to the tax refund, and yet the government was senior at the time of the settlement order when the tax refund was released. These things just cannot be the same. We have a senior and a subordinated creditor. In commercial transactions, what happens is that the subordinated creditor and the senior creditor get together and reach a contract as to what each of the parties can do. Perhaps the subordination right under 509C would have been waived by the government. That did not happen. There could have been an agreement where the United States could not release the right that the surety was going to rely on for equitable subordination or subrogation. That did not occur. The surety could have pursued its objection and not let the settlement get approved or tried to do that. But it agreed to the settlement, wanted a cake-and-eat-it-too. The surety could have made the final payment the day before. Right, that's exactly right. And then, of course, the United States would not have been in a position to settle the case at all because the United States would not have been in the senior position with respect to the tax refund. The United States wanted release from these REA litigation claims. And that was the chief relief that the United States got in addition to having its claim allowed. So if this payment had been made earlier, the United States would have been out of the box in terms of having anything to offer in exchange in a settlement. So we have a senior subordinated situation. We have a date on which you have to determine that. And then consequences flow from that. And that's Section 509 of the Bankruptcy Code, C in particular, a statute that is unambiguous, that's clear. It's not a policy issue. It's not a decisional law question. It's a statute that we respectfully urge requires that the bankruptcy court's opinion be affirmed. Thank you. Thank you very much. That ends Mr. Kent. We'll have you back for rebuttal. Thank you, Your Honors. I'll respond on the issue of 509C. When we entered into the settlement agreement, all right, in the settlement order, when it says nothing in this stipulation will otherwise limit my client's rights, it didn't make a distinction between whether my client's rights were subordinate or primary. The whole idea was for the government to gracefully step out, put the money in escrow, without waiving or otherwise limiting my client's rights. That's what I was moving for in the first place. And when we went to mediation and agreed to this order, we expanded the language. We expanded language because BMO wanted to be included on it, too. And another surety wanted to be included on it, too. And the trustee wanted to be included on it, too. So instead of just saying the surety's subrogation rights, it said anybody's rights in this tax refund, right? We went to the court. It was approved. BMO agreed to it. The government agreed to it. The government was happy to get out of it. So the question of if you enter into a subordination, into an intercreditor agreement, can the primary creditor agree that the subordinate creditor's rights will survive, even though the primary creditor is settling? Of course they can. Freedom of contract. That's what happened here. The government agreed that nothing in its stipulation would impact on my client's rights. It was expressed. Otherwise, you know, in addition, you look at the doctrine of ambiguities, another thing that we look at in contract construction, and this is a document construction case. You also don't go to absurd results, right? My client had a good objection, and we gave away everything for nothing. You know, two of those cases that the trustee presumed to dismiss, they couldn't have dismissed without my client's permission. We were fully subrogated to the trustee's rights, too. This wasn't the only contract we completed. We completed like six contracts at a loss of something like $100 million. Only one contract had to do with this particular debtor, LTC. That was a capital contract. But when we initially objected to this motion, in addition to saying, you know, we wanted to hold on to the tax refund, we also were saying, what is the trustee doing dismissing cases that belong to us? We went to mediation and we agreed to it. We gave up everything in exchange for one thing, right? The right to argue for our subrogation rights in that escrowed tax refund. All right. Now, getting back to the question of the standard of review. The Sinego case talks about that's citing to a Fifth Circuit case. It takes some language from it. That's the national gypsum case. And there's two things that you need to get to that deferential review for bankruptcy court. One is it has to be ambiguous. Because if it's not ambiguous, you're still with DeNovo. Right. The second thing is the Fifth Circuit said it and the Sinego court adopted it in a parenthetical. There has to be an actual interpretation. When BMO made its summary judgment motion, I took that same paragraph, paragraph three, from our settlement order and I cited it something like 10 times because there were a lot of briefs. Right. When Judge Sanche issued his order, there wasn't one word from that order mentioned in the decision. It was just a footnote to the docket number of the words that said there was a settlement. Okay. That's not an actual interpretation. If the bankruptcy court doesn't look at the language and tell you, well, this is what I think it means, that's not an actual interpretation. There's nothing for this panel to show deference to. The silence was deafening. So we appealed. We thought it needed a new set of eyes. Secondly, I will mention, though, there is one case that we missed in our briefs. It was a 2020 case that, again, not on all fours, but it did talk about the standard of review and also involved the tax refund, although it was a married couple instead of a bunch of companies. And that was Somerset Regional Water Resources. It was a bankruptcy case that made it up here last year. It was reported at 949F837. I won't discuss it because it wasn't in the briefs. It wouldn't be fair. I'm just throwing it out there as something that your honors might want to take a look at. It might give a little assistance on that issue of looking at prior bankruptcy orders. Okay. Thank you very much. It was a pleasure to be here. Thank you, Mr. Kent. Thank you, Mr. Benz. The panel will take the case under advisement, issue a decision in due time. We thank you very much for your helpful arguments, and we'll ask the clerk to adjourn the proceedings. Please rise. Thank you. Thank you. Thank you. Thank you. Thank you.